SEABOARD TUG & BARGE, Inc. v. THE LIA.

REDERI AB/DISA (E. Brodin, Mgr.) v. THE ARCO NO. 5.

Nos. 50–69, 53–17–F.

United States District Court
D. Massachusetts.

June 16, 1953.

As Amended July 7, 1953.

No. 53–17–F:

Thomas H. Walsh, Boston, Mass., for plaintiff.

Putnam, Bell, Dutch & Santry and Arthur J. Santry, Jr., Boston Mass., for defendant.

No. 50–69:

Arthur J. Santry (Putnam, Bell, Dutch, & Santry), Boston, Mass., for plaintiff.

Thomas H. Walsh, Boston Mass., for defendant.

FORD, District Judge.

Findings of Fact.

1. On August 9, 1950, the tug Seaboard, a craft some 60 feet long, of 41 gross tons, with the barge Arco No. 5, some 130 feet long, left the plant of the Cities Service Oil Company in Braintree, Massachusetts, at about 6:15 p. m. Both vessels were owned by Seaboard Tug and Barge, Inc. The barge was loaded with a cargo of over 5,000 barrels of fuel oil which was to be delivered to the dock of the White Fuel Company in Boston Harbor.

2. The tug was pushing ahead of it the barge, which was made fast to it by two lines leading from the bow of the tug, one to a bitt on the port after-corner of the barge and the other to a bitt on its starboard after-corner, with two additional lines, one from each of the stern bitts of the barge leading respectively to the port and starboard quarters of the tug and then to the tug's stern bitts, so that the barge and tug operated together as a single unit.

3. This unit proceeded toward Boston Harbor and at about 8:25 p. m. was about to enter the main channel from the Western Way, in the vicinity of Buoy 3.

4. Sunset was about 8 p. m. on that night. The lights on the barge and tugboat had been turned on at about that time, before the unit reached Buoy 3. The tug had a white light on its bow, a red light on the port side and a green light on the starboard side, both on top of the pilothouse. Forgeron, master of the tug, testified that the tug had two white lights on the aftermast, and that the barge had had a white bow light and similar red and green lights on top of the house on the barge, which was about 100 feet back from the bow. The pilot of the Lia denies seeing two white lights on the tug, or any light at all on the barge except a light which was in the house.

5. The crew of the barge-tug unit consisted of the master, Forgeron, who was navigating the unit from the pilothouse of the tug, and two deck hands who were in

the house on the barge, one of them standing at a window facing the front of the barge and acting as lookout.

6. The Motor Vessel Lia, owned and operated by Rederi AB/Disa, left its berth at the Army Base, Reserved Channel, at about 8:15 p. m. on the same evening. Under the control of a coast pilot, Wardlaw, it backed from the pier and maneuvered by backing and filling until it was properly headed to enter and proceed down the main channel.

7. On the same evening, the Grifone, carrying a load of lumber, came up the main channel to a place of anchorage off Bird Island Flats. As the tug-barge unit approached Buoy 3, Forgeron saw the Grifone about a half mile down channel. Forgeron maneuvered his unit into the main channel at Buoy 3. The Grifone passed him on the opposite side of the channel while the tug-barge unit was still at Buoy 3. Forgeron then continued up the main channel from Buoy 3 on the southerly side, that is, on his port side.

8. The Grifone passed the Lia while it was still engaged in its turning maneuver before entering the main channel. Pilot Wardlaw halted the maneuver until the Grifone had passed and then completed the turn and brought the Lia into the main channel.

9. At about 8:29 p. m. when the Lia had been brought into the main channel, pilot Wardlaw turned the vessel over to Holmes, the harbor pilot, who proceeded to take it down the channel on the south side, the engines being ordered to full speed ahead. The top speed of the Lia was 16 or 17 knots, but of course it was only gradually picking up speed during the next four minutes. No exact evidence was offered as to the speed it had attained by 8:33, but the estimate of pilot Holmes that it had reached a speed of 6 or 7 knots seems to be reasonably accurate.

10. The Seaboard with its barge was proceeding up the south side of the channel at its maximum speed of 3½ knots. Its destination was the White Fuel Company, whose place of business was in the Reserve Channel to the south side of the main channel. Forgeron observed the Lia

approaching, slowed his speed somewhat, gave a signal of two blasts of the whistle to indicate a starboard to starboard passing, and changed his course to the left.

11. Holmes on the Lia saw the tug approaching, showing only its white and red lights. He saw no lights on the barge at this point and later, just before the collision, only one white light in a cubby hole on the rear end of the barge. He heard the two-blast signal, and asked the master of the vessel, and pilot Wardlaw, who were on the bridge, if the signal had been two blasts. They replied that it was only one. Holmes then signalled the engines to stop at 8:33 p. m.

12. As the vessels neared each other, shortly before the collision, Forgeron gave a second two-blast signal, then stopped and reversed his engines, giving a three-blast signal followed by a four-blast danger signal. He, at the same time, changed his course sharply to port.

13. Holmes heard the second two-blast signal, saw the tug and barge directly in front of him moving across his bow, gave a four-blast signal and ordered his engines full astern at 8:34 p. m. (A full speed ahead signal was given before this but immediately countermanded before it could be executed.)

14. Within a fraction of a minute thereafter, the two vessels collided, the bow of the Lia hitting the barge at a point on the starboard side of the barge about six feet back from the starboard forward corner. The collision occurred at a point just north of Buoy 3A. The force of the impact broke the barge loose from the tug, and it later sank after being towed to Castle Island Pier. The Lia after the collision continued down the channel for some distance before stopping, having the tug and barge on its starboard as it passed the site of the collision.

15. The collision occurred about an hour before high tide. The night was clear, with visibility extending for several miles. There was no evidence that any vessels were in the main channel near the time of the collision except the Grifone and those involved in the collision.

## Discussion

The tug-barge unit was concededly on its port side of the channel, a seemingly convenient position to take in the light of its destination, and this fact is the basic underlying cause of the collision. The tug was, therefore, at fault in failing to keep to its right in a narrow channel, Art. 25, Navigation Rules for Harbors, Rivers and Inland Waters Generally, 33 U.S.C.A. § 210, unless special circumstances justified a departure from the rule under Art. 27 of the same rules, 33 U.S.C.A. § 212. Libelant Seaboard Tug and Barge, Inc., argues that Forgeron was justified in keeping to the left of the channel because when he first entered the channel he could not have crossed to the right side without running into danger by crossing the bow of the oncoming Grifone, and thereafter could not cross without like danger from crossing ahead of the Lia. This argument must be rejected. The tug-barge unit was still at Buoy 3 when the Grifone passed and the Lia had not yet entered the channel and in fact did not complete its maneuvering until the Grifone had passed it over half a mile up channel. Between the passage of the Grifone, whose presence the two crew members did not even see, and the arrival of the Lia there was ample time for even the slow moving hard-to-maneuver tug-barge unit to cross to the proper side of the channel. It had in fact time to move about 200 yards up channel before it sighted the Lia, and about 600 yards before reaching the spot of the collision. Moreover, while still in the left half of the channel, it had moved over far enough so that it was closer to the center line of the channel than was the Lia. This is indicated by the fact that when first seen from the Lia it was showing its red light, and by the fact that, when it changed its course to its left as the ships approached, this brought it into such a position that at the moment of the collision it was moving across the bow of the Lia from the Lia's port to its starboard side, with the tug and the greater part of the barge still to the Lia's port side.

From this it appears that the tug was further at fault in signaling for a starboard to starboard passing and then attempting to make it. This would have been justified only by accepting Forgeron's testimony that the Lia was showing only its green light as it approached, and rejecting Holmes' testimony that the tug was showing its red light. The facts as to the course and relative positions of the vessels at the time of the collision indicate that the tug was up to that time to the Lia's port, closer to the center of the channel. This agrees with Holmes' testimony as to the lights he saw, and makes it extremely doubtful if Forgeron could have seen the Lia's green light at any time. It thus appears that a port to port passing was called for by the position of the vessels and could have been safely made. It is certain that Forgeron by directing his course to the left and attempting to pass to the starboard side of the Lia, took his vessel straight into the path of the Lia, thus directly causing the collision. A subsidiary cause was Forgeron's desire to short-cut his course to White Fuel Corporation. There was hardly any other reason for Forgeron's failure to keep to starboard.

The barge was also at fault in not having proper lights. Even assuming it had the lights testified to by Forgeron, this did not comply with the requirements of 33 C. F.R. § 80.16(f), in that the red and green lights were not on the bow as required by rule cited, but were on the house 100 feet back from the bow. However, the improper positioning or even the entire absence of lights on the barge does not seem to have contributed to the accident. Even if the barge had been lighted in full compliance with the rule, the additional information thus given to the Lia would not have enabled it to do anything to avoid the collision in view of the tug's conduct in proceeding on a course up the wrong side of the channel and then directly across the path of the Lia.

It must also be found that there was fault on the part of the Lia. There was disagreement between pilot Holmes on the one hand and the master of the Lia and pilot Wardlaw on the other as to whether the Seaboard had given one or two blasts. Holmes was himself, on his own testimony, in doubt as to the course the tug was to

follow, since the two-blast signal which he believed had been given indicated a starboard to starboard passing of the vessels, while the lights from the tug clearly showed that it was in position for a port to port passing. In this situation Holmes merely shut off the engines of the Lia. He should have given the four-blast danger signal. 33 C.F.R. § 80.1; 33 U.S.C.A. § 203, Art. 18, Rule III.

It is, however, difficult to see how this fault on the part of the Lia contributed in any substantial way to the causing of the collision. There was an interval of at most two minutes from the time the first two-blast signal from the barge was given until the collision occurred. Forgeron testified that the vessels were a half mile apart when he gave his first two-blast signal. They must have been much closer than that since even if the Lia had been proceeding at 12 knots, as libelant argues, the vessels could not have closed a half mile gap between them in the time available. It does not seem likely that if, in compliance with the rule, the Lia had given its four-blast danger signal a minute earlier, the slow-moving, cumbersome tug-barge combination could have been so maneuvered in that additional minute as to avert the crash. On the evidence presented it remains merely a matter of speculation whether full compliance with the rules by the Lia would have helped in any way to prevent the collision.

It is very doubtful that if the Lia had reversed its engines at 8:33 instead of 8:34 this would have slowed its progress enough to have avoided the collision. The tug-barge unit was proceeding directly across the Lia's course when it was struck near its bow. Since this unit was a slow-moving one of almost 200 feet in length, further slowing of the Lia would have resulted only in the barge being hit farther back from the bow. It seems extremely unlikely that in the time and space available, the Lia could have been slowed sufficiently to allow the tug and barge to pass safely all the way across its course.

Under the circumstances, the night being clear and the channel not crowded with shipping, it does not seem to have been imprudent navigation for Holmes to have ordered the engines to full speed ahead when the Lia started down the channel.

The conclusion must be that the tug Seaboard was at fault in proceeding up the channel on the wrong side without justification, and in directing its course directly across the course of the oncoming Lia in an attempt to pass on the starboard side of the Lia, and that these faults were the direct and proximate cause of the collision. Even if the Lia were at fault in failing to reverse its engines and give the danger signal when in doubt as to the course of the tug and barge, it has not been shown that this fault was a contributing cause of the collision.

The ultimate conclusion of fact and law is that the sole cause of the collision was the fault of the tug Seaboard.

Decrees accordingly.